**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Shane McGough, | No. CV-18-01302-PHX-DJH (DMF) |
| Plaintiff, | **ORDER** |
| v. | |
| Paul Penzone, et al., | |
| Defendants. | |

Plaintiff Shane McGough, through counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendants Maricopa County Sheriff Paul Penzone, Maricopa County Sheriff's Office (MCSO) Deputy Shaun Richard Eversole, and Eversole's spouse move for summary judgment. (Doc. 102). Plaintiff opposes the Motion. (Doc. 126). Defendants have also filed a Motion to Exclude (Doc. 95) Plaintiff's expert, W. Ken Katsaris, which Plaintiff opposes (Doc. 101).

The Court will deny the Motion for Summary Judgment and will deny the Motion to Exclude without prejudice to refiling.

**I.     Background**

In the Amended Complaint (Doc. 16),[1] Plaintiff alleges that Defendant Eversole used excessive force against him by deploying a police dog to bite Plaintiff and allowing

---

[1] Plaintiff also named as Defendants Deputy Alden Jamaal Jackson and Officer Kelly Marie Fleming and their respective spouses. (Doc. 16 at 2-3.) Jackson and Fleming were dismissed from this action pursuant to the parties' stipulation on February 14, 2019. (Doc. 58.)

the dog to continue to bite Plaintiff for more than three minutes, in violation of the Fourth and Fourteenth Amendments. (*Id.* at 9 ¶¶ 43-47.)[2] Plaintiff also asserts a state-law claim of battery. (*Id.* at 8-9 ¶¶ 40-42.) Plaintiff sues Defendant Penzone in his official capacity only for the state law battery claim under a theory of vicarious liability. (*Id.* at 2 ¶ 4.)

Plaintiff also asserted Fourth and Fourteenth Amendment claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) (Count Three) and a state law claim of reckless or negligent conduct (Count Four). (Doc. 16 at 10.) On February 14, 2019, the Court granted the parties' Stipulation of Dismissal as to Defendants Jackson and Fleming; Plaintiff's respondeat superior claim against Defendant Penzone in Count One arising from Defendant Jackson's conduct only; Plaintiff's *Bivens* claims (Count Three); and Plaintiff's reckless or negligent conduct claim (Count Four). (Doc. 58.) Thus, the remaining Defendants are Defendants Eversole and Penzone, and the remaining claims are Count One (battery) and Count Two (Fourth and Fourteenth Amendment claims pursuant to § 1983.) (Doc. 60 at 1-2.)

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

---

[2] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III. Facts

#### A. Parties' Statements of Fact

On July 15, 2017, at the Salt River Recreation parking lot, non-parties MCSO Deputies Finney and Crissinger were involved in a physical altercation with Plaintiff. (Doc. 107 at 1-4 ¶¶ 1-22.) During the altercation, Deputies Crissinger and Finney suffered injuries. (Doc. 107-2 at 112; Doc. 128 at 5 ¶ 22.) MCSO Deputy Hossack responded to Deputy Finney's request for backup. (Doc. 107 at 4 ¶ 23.) Eventually, Plaintiff's hands were restrained behind him, and Deputies Finney and Hossack escorted him to a patrol vehicle. (Doc. 128 at 5 ¶¶ 25, 30; *id.* at 9 ¶ 42.) Deputy Hossack decided to place Plaintiff in United States Forest Service Officer Fleming's vehicle for transport to the nearby MCSO substation. (*Id.* at 6 ¶ 30.)

Defendant Eversole arrived at the scene sometime after Plaintiff had been restrained behind his back and placed in the backseat of Officer Fleming's vehicle. (*Id.* at 7 ¶ 36; *id.* at 11 ¶ 52.) Defendant Eversole saw Deputy Crissinger on a gurney with a splint on his leg. (*Id.* at 11 ¶ 53.) The parties dispute in part what information the other officers

conveyed to Defendant Eversole regarding the earlier altercation with Plaintiff.[3] It is undisputed, however, that Officer Fleming told Defendant Eversole that Plaintiff "would fight," and Deputy Hossack "confirmed that Plaintiff was a fighter." (*Id.* at 8 ¶ 37.)

Officer Fleming drove Plaintiff to the MCSO substation, followed separately by Deputy Jackson and Defendant Eversole. (*Id.* ¶ 55.) After they arrived at the station, Officer Fleming opened the vehicle door and gave Plaintiff two verbal directives to get out of the vehicle, but Plaintiff refused. (*Id.* ¶ 56.) Officer Fleming observed that Plaintiff had "slipped his handcuffs from the back to his front" during the drive to the substation. (Doc. 107-2 at 51; Doc. 128 at 12 ¶ 57.) Fleming closed the door and waited for Deputy Jackson and Defendant Eversole to assist in removing Plaintiff from the vehicle. (Doc. 107-2 at 52; Doc. 128 at 12 ¶ 59.)

When Defendant Eversole arrived at the substation, he removed Shadow, his law enforcement K-9, from his vehicle and approached Officer Fleming's vehicle with Shadow on-lead. (Doc. 128 at 12 ¶ 60.) When Defendant Eversole and Deputy Jackson were "ready," Officer Fleming opened the door and gave Plaintiff two verbal directives to get out of the car. (*Id.* ¶ 61.) Defendant Eversole also gave Plaintiff verbal directives to "step out slowly." (*Id.*) Plaintiff states that he did not refuse those commands but was not given enough time to comply and ten seconds after Officer Fleming opened the vehicle door, Deputy Jackson "forcibly" removed Plaintiff by his handcuffs from the vehicle. (*Id.* at 23 ¶ 12.)

Defendants dispute this characterization of Deputy Jackson's conduct. Officer Fleming testified that when the deputies arrived, they "asked [Plaintiff] to get out of the vehicle again, and he didn't." (Doc. 107-2 at 52.) Officer Fleming testified that she then went to the passenger side of her vehicle to assist Deputy Jackson in removing Plaintiff

---

[3] Defendant Eversole avers in a Declaration that other deputies advised him that there had been a physical altercation between Plaintiff and Deputies Crissinger and Finney; that Plaintiff had struck Deputy Finney in the nose and/or face; that Deputy Crissinger broke his leg during the altercation with Plaintiff; and that Plaintiff was involved in another altercation with Deputy Hossack as Hossack was putting Plaintiff in handcuffs. (Doc. 107-2 at 100-01 ¶ 9.)

from the vehicle. (*Id.*) Defendant Eversole states in his Declaration that when Plaintiff "continued to refuse directives to get out of the vehicle, Deputy Jackson went hands-on" and pulled Plaintiff out of the vehicle and onto his feet. (*Id.* at 101 ¶ 13.) It is undisputed that Defendant Eversole warned Plaintiff that if he fought or made any "aggressive movements," Shadow would bite him. (Doc. 128 at 12 ¶ 64.)

Plaintiff asserts that he did not fight or otherwise actively resist Defendant Eversole, Deputy Jackson, and Officer Fleming while they escorted him to the MCSO holding cell. (*Id.* at 23 ¶ 13.) Defendants dispute this. Defendant Eversole avers that he observed Plaintiff "actively attempting to pull away from Deputy Jackson and to the right." (Doc. 107-2 at 101 ¶ 14.) Defendant Eversole further declares that he could see Plaintiff's body "tensing against Deputy Jackson's grip," and he continued to be "verbally aggressive and argumentative." (*Id.*) It is undisputed that Defendant Eversole gave Plaintiff a directive to walk "as directed by Deputy Jackson" and again warned Plaintiff that if he "began fighting, he would get bit." (Doc. 128 at 14 ¶ 68.)

Deputy Jackson escorted Plaintiff into a holding cell and placed Plaintiff on the concrete bench along the left side of the cell. (*Id.* ¶ 69.) Deputy Jackson told Plaintiff that he was going to remove the handcuffs and asked Plaintiff to extend his arms out in front of him to allow him to do so. (*Id.*) Plaintiff complied, and Deputy Jackson tried to remove the handcuffs. (*Id.* ¶ 70.) At one point, Plaintiff tried to stand up, but Deputy Jackson immediately pushed him back down onto the bench. (*Id.* at 23 ¶ 14.)

Plaintiff was "verbally obnoxious" at this point, but he did not "resist the officers or lunge at them. (*Id.* at 24 ¶ 16.) Officer Fleming, who had been standing several feet away, told Plaintiff to "calm down," moved toward Plaintiff, and "str[uck] him in the throat area." (*Id.*) Plaintiff "kicked out his right leg in the direction of Officer Fleming only after she struck him with both hands in the neck area." (*Id.* ¶ 17.) The kick "was an instinctive movement" and did not make contact with any of the officers. (*Id.*) Deputy Jackson pulled Plaintiff off the cell bench and "took him to the floor." (*Id.* ¶ 18.) Plaintiff did not resist and stated that he was getting down on the floor. (*Id.* ¶ 19.) Immediately after Deputy

Jackson took Plaintiff to the floor and held him down, Defendant Eversole deployed Shadow.  (*Id.* at 25 ¶ 21.)

Approximately 90 seconds after Defendant Eversole deployed Shadow, Deputy Jackson removed one of Plaintiff's handcuffs.  (Doc. 128 at 17 ¶ 83.)  Shadow bit Plaintiff for more than three minutes.  (*Id.* ¶ 82.)  While Shadow was biting Plaintiff, Plaintiff "screamed in fear and pain begging for the attack to stop."  (*Id.* at 26 ¶ 30.)  Plaintiff tried to comply with the orders he was given, and he did not kick out or swing his legs or hands at anyone.  (*Id.*)  His movements were only "flinching and involuntary and reflexive reactions" to Shadow biting him.  (*Id.*)

Defendants dispute aspects of Plaintiff's characterization of these events. Defendant Eversole avers that as Deputy Jackson tried to remove Plaintiff's handcuffs while Plaintiff sat on the bench, Plaintiff "continued to yell and curse" and "actively resist[ed] Deputy Jackson by moving his hands."  (Doc. 107-2 at 102 ¶ 17.)  Defendant Eversole declares that Plaintiff then "made an overt movement and began to actively fight Deputy Jackson by suddenly rising off the bench and bringing his hands towards Deputy Jackson as if to strike him."  (*Id.* ¶ 18.)  Defendant Eversole gave Shadow the bite command, but Shadow did not bite Plaintiff.  (*Id.*)  Defendant Eversole avers that Plaintiff "continued to actively fight Deputy Jackson, and appeared to lunge towards Officer Fleming with his torso, who used her hands to push [Plaintiff] back towards the wall by pushing his upper chest area."  (*Id.* ¶ 19.)  Defendant Eversole states that Plaintiff "kicked at" Officer Fleming and Deputy Jackson, but Eversole did not see whether Plaintiff made contact with either of them.  (*Id.* ¶ 20.)

According to Defendant Eversole, after Deputy Jackson took Plaintiff to the floor, Plaintiff "continued to actively resist."  (*Id.* ¶ 21.)  Defendant Eversole avers that he then deployed Shadow with a placement bite[4] on the upper rear portion of Plaintiff's thigh.  (*Id.* ¶ 22.)  That is, Defendant Eversole "grabbed Shadow's collar on both sides in order to

---

[4] With a placement bite, the handler directs the canine to bite a specific location. (Doc. 107-2 at 102.)

control his head and neck movements and guide him to the specific bite location while giving him a verbal bite command." (*Id.* at 102-03 ¶ 22.) Shadow bit and "remained on the bite in that same location" for more than three minutes. (*Id.* ¶ 24.) Defendant Eversole declares that he kept Shadow "on bite" because the situation was not under control, as Plaintiff was "still physically resisting commands," striking and kicking Eversole with his feet, and Plaintiff was not in a "position of control" that would allow Eversole to safely remove Shadow from the bite. (*Id.*)

While Shadow was biting Plaintiff, Deputy Jackson continued to try to remove the handcuffs. (*Id.* at 27.) Defendant Eversole states while Plaintiff was on the floor, Defendant Eversole was positioned near Plaintiff's legs, with Shadow between his feet. (Doc. 107-2 at 103 ¶ 25.) Defendant Eversole declares that Plaintiff kicked him at least two or three times in Eversole's right arm "by making a motion with his heel towards his buttocks." (*Id.*) Defendant Eversole further avers that he gave Plaintiff "repeated directives" not to kick him, as well as "other verbal directives not to move." (*Id.*) Defendant Eversole declares that when he observed that Plaintiff was "not as tense," was no longer striking, was more compliant, and that the situation was "more in control," he "verified with Deputy Jackson that he had control." (Doc. 107-2 at 104 ¶ 30.) Defendant Eversole states that he then removed Shadow from the bite using the "tactical out method," in which Eversole applied backwards pressure on Shadow's collar to create a gag reflex, causing Shadow to release the bite. (*Id.* ¶ 32.)

Defendant Jackson discovered that the handcuff key had broken off in the first handcuff, which was why he could not remove the handcuff. (Doc. 128 at 19 ¶ 91.) The second handcuff was removed with bolt cutters. (*Id.* ¶ 92.) Plaintiff was transported to the hospital for evaluation and treatment. (*Id.* ¶ 93.) Plaintiff suffered multiple deep puncture wounds and lacerations from Shadow biting him. (Doc. 128 at 28 ¶ 40.) His injuries required follow up wound care and prophylactic antibiotic medication to prevent possible infection from the dog bites. (*Id.* at 29 ¶ 42.) The dog bites have left Plaintiff with numbness and deep and discolored permanent scars on his upper thigh area. (*Id.* ¶ 43.)

Plaintiff also received counseling from a mental health therapist for emotional distress.  (*Id.* ¶ 44.)

Plaintiff was charged in Maricopa County Superior Court, case #CR2017-132709, with three counts of aggravated assault on an officer and one count of resisting arresting-physical force.[5]  Plaintiff pleaded guilty to a reduced charge for one of the aggravated assault counts, and the remaining charges were dismissed.[6]

**B.    Video Evidence**

The parties have submitted copies of Defendant Eversole, Deputy Jackson, and Officer Fleming's respective body-worn camera video footage.  (*See* Doc. 109-1, Attachment C to Declaration of Sergeant A. J. Jackson (hereinafter, "Jackson Body Cam Video"; *id.* Attachment C to Declaration of Shawn R. Eversole (hereinafter, "Eversole Body Cam Video"); Doc. 119-1, Attachment B to Declaration of Officer Kelly M. Fleming (hereinafter, "Fleming Body Cam Video")).  Plaintiff has submitted a transcript of the "audible speaking" during each of the videos.  (Doc. 129-5 at 2-3.)

Where the parties' versions of events differ, the Court takes Plaintiff's facts as true. *See Anderson*, 477 U.S. at 255.  Where there is also video footage of the incident giving rise to Plaintiff's excessive force claim, the Court considers the facts in the light depicted by the video, but still draws all inferences from the video in Plaintiff's favor.  *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"); *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)).  However, "when opposing parties tell two

---

[5]    *See*    http://www.superiorcourt.maricopa.gov/docket/CriminalCourtCases/caseInfo.asp?caseNumber=CR2017-132709 (last accessed Sept. 1, 2020).

[6] *Id.*

different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott,* 550 U.S. at 378-79.

The Court has reviewed the videos and concludes that they do not definitively support either Plaintiff or Defendants' version of the events at the MCSO substation and in the holding cell. Each of the three videos begins as Plaintiff and the officers arrive at the MCSO substation. Officer Fleming exits her vehicle, opens the door, and orders Plaintiff to get out of her vehicle, but Plaintiff does not exit the vehicle. (Fleming Body Cam Video at 00:01-00:08.) Officer Fleming then walks toward Defendant Eversole and Deputy Jackson. (*Id.* at 00:10-00:53.)

Officer Fleming, Deputy Jackson, and Defendant Eversole approach Officer Fleming's vehicle, with Defendant Eversole holding Shadow on-lead. (Eversole Body Cam Video at 00:01-00:08.) Officer Fleming opens the door, motions for Plaintiff to get out of the vehicle, and instructs him, "You're going to step out slowly." (Fleming Body Cam Video at 00:53-01:02.) Plaintiff repeatedly asks what he was done wrong and why he is being arrested. (*Id.* at 01:02-01:08.) Deputy Jackson tells Plaintiff, "Step out, or I'm going to pull you out." (Eversole Body Cam Video at 00:35-00:38.) Deputy Jackson pulls Plaintiff out of the vehicle, and Defendant Eversole tells Plaintiff, "If you fight, you're going to get bit." (*Id.* at 00:38-00:42.) Plaintiff responds, "All right. All right." (*Id.* at 00:42-45.) As the officers and Plaintiff walked toward the building, Plaintiff continues to ask why he is being arrested. (Jackson Body Cam Video at 00:26-00:33.) Defendant Eversole tells Plaintiff, "No aggressive movements, or you're going to get bit." (*Id.* at 00:33-00:35.) Defendant Eversole tells Plaintiff, "You're going to walk inside. You make any threats or movements, you're going to get bit. Am I clear?" (Eversole Body Cam Video at 00:36-00:50.) Plaintiff responds, "Yes, you're clear. What am I being arrested for?" (*Id.* at 00:50-00:52.)

Plaintiff and the officers enter the holding cell, and Plaintiff raises his hands in front of him. (Jackson Body Cam Video at 00:40-00:50.) Deputy Jackson appears to push

Plaintiff's hands away and push Plaintiff down so that he is seated on the bench inside the cell. (*Id.* at 00:50-00:52; Eversole Body Cam Video at 00:33-00:55.) Plaintiff says, "Don't fucking touch me. You just have to be a fucking pussy. What have I done wrong? Why am I being arrested?" (Fleming Body Cam Video at 01:40-01:45; Jackson Body Cam Video at 00:52-1:05.) Plaintiff continues to ask what he has done wrong and why he is being arrested and states, "You have to tell me why. I deserve to know why." (Jackson Body Cam Video at 01:05-01:06.) Deputy Jackson tosses what appears to be a set of keys toward the door of the holding cell, which causes Defendant Eversole and Shadow to react. (Eversole Body Cam Video at 01:15-01:22.)

Officer Jackson attempts to unlock Plaintiff's handcuffs. (Jackson Body Cam Video at 01:10-01:26.) Plaintiff continues to yell, but he does not appear to be struggling as he sits on the bench. (*Id.*) Deputy Jackson instructs Plaintiff, "Hands on your head." (*Id.* at 01:26.) Plaintiff starts to respond, "Fuck---", and Deputy Jackson again orders Plaintiff, "Put your hands on your head." (*Id.*) Plaintiff quickly starts to stand. (*Id.* at 01:26-01:27.) Deputy Jackson pushes Plaintiff back down onto the bench. (*Id.* at 01:27-01:29.) At the same moment, Defendant Eversole tells Shadow, "Sic[],"[7] and Shadow moves toward Plaintiff but does not bite him. (*Id.* at 01:29-01:31; Eversole Body Cam Video at 01:40-01:45.) Defendant Eversole then pulls Shadow away from Plaintiff. (Jackson Body Cam Video at 01:31-01:33.)

Plaintiff continues to yell, and it appears that Officer Fleming pushes Plaintiff back with two hands at his throat. (*Id.* at 01:33-01:37.) It is not clear from the videos what, if anything, Plaintiff did before Officer Fleming pushes him. Officer Fleming tells Plaintiff, "Don't touch him," and Plaintiff responds, "I didn't, motherfucker." (*Id.* at 01:37-01:40.) Officer Fleming tells Plaintiff to calm down, and Plaintiff says, "Bitch, fuck you." (*Id.* at 01:40-01:42.) Officer Fleming tells Plaintiff, "Don't kick me." (*Id.* at 01:42.) Plaintiff's legs are not visible on the videos. Plaintiff responds, "Don't fucking touch me." (*Id.* at

---

[7] The audio is unclear as to whether Defendant Eversole says "sit" or "sic" to Shadow; either way, the canine does not bite Plaintiff at this time.

01:42-01:45.) At this point, Defendant Eversole and Shadow have moved near Plaintiff. (*Id.*) Officer Fleming says, "Don't kick me or you're going to—." (*Id.* at 01:45-01:46.) Plaintiff responds, "Fuck you and your stanky ass, bitch." (*Id.*) Deputy Jackson pulls Plaintiff off the bench and pushes him to the floor of the holding cell. (*Id.* at 01:46-01:51.) Plaintiff says, "I'll get on the ground." (*Id.* at 01:51-01:53.)

Once on the floor, Plaintiff is positioned on his back with his hands in front of him. Deputy Eversole directs Shadow to bit Plaintiff on his upper leg. (*Id.*; Eversole Body Cam Video at 02:10-02:20.) Plaintiff continues to ask what he has done wrong and asks Defendant Eversole to let Shadow go, and Eversole replies, "When you comply." (Jackson Body Cam Video at 01:50-02:05.) Plaintiff says, "I comply. I comply. I comply." (*Id.* at 02:05-02:14.) Defendant Eversole is crouched down with Shadow between his legs as Shadow is biting Plaintiff. (Fleming Body Cam Video at 02:40-02:45.) It is not clear from the videos whether Plaintiff is kicking or otherwise resisting.

Officer Fleming appears to hand Deputy Jackson a handcuff key. (*Id.* at 02:32-02:38.) Deputy Jackson continues to try to unlock Plaintiff's handcuffs. (*Id.*) Plaintiff is directed to put his hands on his head, and Plaintiff moves his hands above his head while Deputy Jackson tries to unlock the handcuffs. (*Id.* at 02:42-03:08.) Defendant Eversole orders Plaintiff to "comply with the Deputy now." (*Id.* at 03:08.) Plaintiff replies, "I'm complying, sir." (*Id.* at 03:08-03:11.) An officer says, "See if we can get them," and another officer responds, "They might be broke." (*Id.* at 03:11-03:19.) Plaintiff asks what the officers want him to do and is again directed to put his hands on his head. (*Id.* at 03:19-03:23.) At this point, Plaintiff is on his stomach. (*Id.*)

Deputy Jackson unlocks one of Plaintiff's handcuffs, and Plaintiff says, "It really fucking hurts, sir. It really fucking hurts." (*Id.* 03:23-03:49.) Plaintiff asks Defendant Eversole to stop Shadow. (*Id.* 03:49-03:59.) Deputy Jackson says, referring to the handcuff key, "Yeah, it's broken in there." (*Id.* at 04:16.) Deputy Jackson tells Plaintiff, "Stop kicking me." (*Id.* at 04:16.) Plaintiff says, "I'm trying not to move. Please stop the dog. Please stop it." (*Id.*) Plaintiff's legs are not visible on any of the videos.

Deputy Jackson asks an officer to get some bolt cutters, and the officer responds, "Where are they?"  (*Id.* at 04:16-04:24.)  An officer tells Plaintiff to put his hands on his head and to put his face down.  Deputy Jackson says, "The key is broken."  (*Id.* at 04:39.)  Defendant Eversole asks Jackson whether they were "good to remove" Shadow from Plaintiff.  (*Id.* at 04:42.)  Deputy Jackson responds, "Huh?" and Defendant Eversole asks, "Do you think we are good to remove?"  (*Id.* at 04:42-04:44.)  Plaintiff says he will comply, and he is ordered put his hands on his head and not to move.  (*Id.* at 04:44-04:46.)  Plaintiff repeats that he will comply.  (*Id.* at 04:45-04:52.)  Deputy Eversole removes Shadow from Plaintiff's upper leg.

## IV.    Excessive Force

### A.    Fourth Amendment Standard

The Ninth Circuit has held that officers' use of a police dog is subject to excessive force analysis.  *See Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998); *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994).  To establish that the use of force is excessive, a plaintiff must establish that the use was "objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 392 (2015).  Determining whether the force used was reasonable requires a "careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Graham v. Connor*, 490 U.S. 386, 395-96 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).  In assessing objective reasonableness, a court must consider "the facts and circumstances of each particular case."  *Kingsley*, 576 U.S. at 392 (quoting *Graham*, 490 U.S. at 396).  Courts making such determinations must view the facts "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."  *Id.*

In the context of a detainee like Plaintiff,[8] factors to consider in assessing the

---

[8] Throughout their briefing, the parties primarily cite to cases that assess the reasonableness of force used in accomplishing an arrest of a suspect, not cases that assess the reasonableness of force used to ensure control over a detainee after an arrest has been made.  *Graham* and *Kingsley* make clear that certain factors relevant to an assessment of

reasonableness of force may include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* at 397. This list is not exhaustive, but only "potentially relevant to a determination of excessive force." *Id.* Courts have also considered whether proper warnings were given before the force was applied and the "relative culpability" of the parties in creating the dangerous situation. *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010) (considering officer's failure to warn plaintiff that he would be shot if he did not comply with the officer's orders and what other tactics, if any, were available to effect the arrest in determining whether force used was reasonable); *Scott*, 550 U.S. at 384 (noting that the parties' "relative culpability" *i.e.,* which party created the dangerous situation and which party is more innocent, may also be considered).

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott*, 550 U.S. at 381 n.8. An officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). The Ninth Circuit "has often held that in police misconduct cases, summary judgment should only be granted 'sparingly' because such cases often turn on credibility determinations by a jury. *Espinosa v. City and Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (quoting *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir.

_____

reasonableness of force in one context may not be as relevant in another context; indeed, both cases instruct lower courts to make their reasonableness determinations on a case by case basis, taking into account considerations relevant to the particular circumstances of each case. *Kingsley*, 576 U.S. at 392 (quoting *Graham*, 490 U.S. at 396). Because Shadow was deployed after Plaintiff had been detained, the court will focus on the factors articulated in *Kingsley*, which for all intents and purposes, do not differ significantly from the traditional *Graham* factors, but with some minor perspective differences to account for the circumstances of detainment.

2003). Likewise, because the excessive force balancing test is "inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

**B. Relevant Objective Reasonableness Considerations**

**i. Force Used**

The Ninth Circuit has noted that when assessing reasonableness of the force used, it is important to keep in mind the magnitude of the pain and injuries caused by the use of force. *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011). Accordingly, the Court will first assess the quantum of force that was used to subdued Plaintiff, in part by assessing the extent of Plaintiff's injuries.

The Ninth Circuit's precedent "establishes that characterizing the quantum of force with regard to the use of a police dog depends on the specific factual circumstances." *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017); *see id.* (use of force was "moderate" where the police dog bit the plaintiff's upper lip, causing it to bleed, and the plaintiff received three stitches); *Smith*, 394 F.3d at 701-02 (finding force used against plaintiff was "severe" when officers sicced a canine on the plaintiff three times, at least once after he was pinned down, and pepper sprayed his wounds); *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994) (concluding that "the force used to arrest [the plaintiff] was severe" because the dog bit the arrestee plaintiff three times, dragged him between four and ten feet, and "nearly severed" his arm); *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003) (finding use of dog to apprehended a fleeing suspect with a bite that lasted between 45 and 60 seconds, "shredded" the plaintiff's muscles, and reached the bone was "serious").

It is undisputed that Shadow bit Plaintiff's leg for more than three minutes. In addition, Defendants do not dispute that Plaintiff suffered serious injuries to his leg as a result of the dog bite. Defendants nonetheless characterize the type and amount of force inflicted "as moderate at most." (Doc. 102 at 12). The Court disagrees, and has no trouble finding that the type and amount of force used was significant. Intermediate or significant force is "capable of inflicting significant pain and causing serious injury." *Young v. Cnty. of L.A.*, 655 F.3d 1156, 1161 (9th Cir. 2011) ("while less severe than deadly force, [intermediate force] nonetheless present[s] a significant intrusion upon an individual's liberty interests"). Plaintiff's injuries, which included multiple deep puncture wounds and lacerations, are much more akin to the "severe" injuries suffered by the plaintiffs in *Smith*, *Chew*, and *Miller*, and differ in kind and extent from the "moderate" injury sustained by the plaintiff in *Lowry*, when a police dog briefly bit the plaintiff's lip. Because the record shows that the forced used to subdue Plaintiff was enough to cause substantial physical injury, the force must be justified by a similar level of "government interest [that] compels the employment of such force." *See Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001).

### ii.      Need for Force

Defendants argue that the deployment of Shadow was necessary to render Plaintiff fully compliant and to secure the officers' safety. Plaintiff argues that he posed no threat to the officers in the jail cell at the time Shadow was deployed, noting that at the time the canine was deployed, he was unarmed, handcuffed, and surrounded by three, armed law enforcement officers. (Doc. 126 at 11).

"[E]ven where some force is justified, the amount actually used may be excessive." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). Thus, the quantum of force used "must be justified by the governmental interest involved." *Bryan*, 630 F.3d at 826. The "factors bearing on the reasonableness of a particular application of force[] are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure.'" *Smith*, 394 F.3d at 101 (quoting *Chew*, 27 F.3d at 1441). The Supreme Court has stated

that the "most important" factor in assessing the government's need to use force is whether Plaintiff "posed an immediate threat to the safety of the officers or others." *Mattos*, 661 F.3d at 441. When considering whether there was an immediate threat, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281. Moreover, "whether a reasonable jury would necessarily find that [Defendant Eversole] perceived an immediate threat of death or serious physical injury" when he commanded Shadow to bite Plaintiff and hold him on bite for three minutes "requires [the Court] to consider exactly what was happening when" that command was given and until Shadow was released from Plaintiff. *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014).

Construing the facts in the light most favorable to Plaintiff, as required by the summary judgment standards, the Court finds that a reasonable jury could conclude that despite Plaintiff's belligerence, Plaintiff did not pose an immediate threat to the officers while he was handcuffed in the jail cell and surrounded by three officers and a police dog. Defendants argue that while inside the holding cell, Plaintiff attempted to strike Deputy Jackson with his hands and kick at Deputy Jackson, Officer Fleming, and Deputy Eversole. (Doc. 102 at 13). Defendants also argue that after Deputy Jackson removed one of the handcuffs, "Plaintiff had access to a dangerous weapon in the form of a loose handcuff." (*Id*.) Defendant Eversole further avers that Plaintiff's prior conduct led him to believe that Plaintiff "intended to fight" and that he deployed Shadow to stop Plaintiff's "active aggression and prevent further injuries to law enforcement officers." (Doc. 107-2 at 102 ¶ 22).

Plaintiff presents his own competing evidence as to "exactly what was happening" just prior to Shadow's deployment and in the minutes thereafter. According to Plaintiff's deposition testimony, his attempt to stand while in the cell was not an attempt to lunge at Deputy Jackson or Fleming, but in response to Officer Fleming's attempt to kick him. (Doc. 129-1 at 101:6-8). Plaintiff testified that "[Deputy] Jackson sat me back down before I could fully stand, even. And then not much longer, but after…[Deputy Fleming] lunged

at my throat twice." (*Id.* at 103:16-19). Plaintiff further testified that he did not try and kick Officer Fleming while he was sitting on the bench (*id.* at 103:20-22), did not do anything to resist Deputy Jackson when he was pulled off the bench and put on the floor (*id.* at 104:15-18), and that the only movements he made during his time on the floor and after Shadow had been deployed were "flinches and – and movements from the dog biting my tendons and stuff." (*Id.* at 109:11-14). As noted, the video evidence does not conclusively confirm or negate these claims, particularly as to Plaintiff's movements on the floor, which are largely out of the cameras' view. Moreover, Defendants suggest that the danger to them was heightened once one of the handcuffs was removed on the theory that Plaintiff could then use the handcuff as a dangerous weapon. Yet, there is no evidence or allegation that Plaintiff made any verbal or threatening movements to indicate he was going to use the handcuff that way. The video evidence suggests that the handcuff was removed over 90 seconds after Shadow was deployed, when Plaintiff was on the floor with an officer standing over him and Shadow biting his leg. The fact that this potential danger was at least in part caused by Deputy Jackson's decision to remove Plaintiff's handcuffs is not lost on the Court, and undermines Defendants' assertion that Plaintiff posed a threat to them at this point. (Doc. 126 at 2). *Scott*, 550 U.S. at 384 (the parties' "relative culpability" *i.e.,* which party created the dangerous situation and which party is more innocent, may also be considered by a court in determining the reasonableness of force used).

Based on the record, there is a factual dispute that prevents the Court from finding, as a matter of law, that Plaintiff's actions would have made a reasonable officer believe he was a threat to the officers' safety and thus the amount of force used to compel Plaintiff's compliance was reasonable. Viewing the facts in the light most favorable to Plaintiff, a jury could find that a reasonable officer would not have perceived an immediate threat to his safety or that of other officers before deploying Shadow on Plaintiff and keeping him on bite for three minutes in order to curb the threat.

### 2. Other Relevant Factors Support Denial of Summary Judgment

Other relevant factors the Court has considered in determining the reasonableness of the force Defendant Eversole used do not change the ultimate conclusion that a factual dispute precludes summary judgment here. For example, the Court considered whether alternative methods were available for subduing Plaintiff in assessing whether it was reasonable to sic a dog on him. *See Chew*, 27 F.3d at 1441 n.5. Though police officers "need not avail themselves of the least intrusive means of responding to an exigent situation…[they] are 'required to consider [w]hat other tactics if any were available,' and whether there were 'clear, reasonable and less intrusive alternatives' to the force employed, that 'militate against finding [the] use of force reasonable.'" *Glenn v. Wash. Cnty.*, 673 F.3d 864, 876 (9th Cir. 2011) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) and *Bryan*, 630 F.3d at 831 (citation and quotation omitted), respectively).

Defendants do not discuss whether other, less intrusive alternatives were considered before Deputy Eversole deployed Shadow, but merely state, "[i]t was only because of Shadow that Plaintiff finally relented and became compliant." (Doc. 102 at 13). Moreover, they do not otherwise explain how other, less invasive tactics, would have been ineffective. In a similarly conclusive manner, Plaintiff argues that if his actions inhibited officers from removing Plaintiff's handcuffs, the officers "could easily have just left him alone in the cell until he calmed down." (Doc. 126 at 13.) But Plaintiff offers no evidence to support the effectiveness of this alternative technique. *Id.* Deputy Eversole, as noted, was not required to use *no* force to subdue Plaintiff by leaving him alone in the holding cell. *Id.* This factor is, at best, neutral.

The Court also considered what efforts Defendants used to temper the amount of force used. *Kingsley*, 576 U.S. at 397. Defendants state that Defendant Eversole took measures to limit the injury to Plaintiff by deploying Shadow with a placement bite[9] on the upper rear portion of Plaintiff's thigh. (Doc. 107-2 at 103 ¶ 22.) They further represent that "Deputy Eversole placed Shadow carefully, and Shadow appears to have re-adjusted

---

[9] With a placement bite, the handler directs the canine to bite a specific location. (Doc. 107-2 at 102).

only once, an act necessitated by Plaintiff's own actions." (Doc. 102 at 12). They also say that when Shadow was released, Deputy Eversole used a "tactical out procedure" that mitigated against tearing. (*Id.*) It is undisputed that Defendant Eversole was in control of Shadow at all relevant times. Plaintiff, however, disputes Defendants' effort to minimize the amount of force that was deployed, and argues the "very nature of the force used—a large dog forcibly and repeatedly biting a nearly naked man for over three minutes" belies Defendants' depiction of the injuries that were ultimately caused as moderate. (Doc. 126 at 13).

The Court finds that the mitigating use of a placement bite and/or tactical out procedure is too intertwined with the disputed facts over whether it was necessary under these circumstances to deploy Shadow or keep Shadow on bite for three minutes. In other words, even if the Court were to accept Defendants assertions that the placement bite was an attempt to minimize unnecessary harm to Plaintiff, this fact may be negated by the necessity to deploy Shadow at all—or, to keep him on a placement bite for the entire three minutes. If, as discussed in more detail *infra*, at any relevant point in time, Plaintiff became compliant or under the control of the officers, the use of a canine to render compliance would have been unnecessary and thus unreasonable. Viewing the evidence in the light most favorable to Plaintiff, which the Court is required to do at this stage, a jury could find that Plaintiff became and remained compliant at several points before and after Defendant Eversole deployed Shadow, e.g., when he was handcuffed and put in to the car, when he walked into the jail cell, when he told Officer Jackson he would get on the floor, or during the bite, when Plaintiff was on the floor with his hands above his head, repeatedly yelling, "I comply! I comply!" If the jury so finds, then deploying Shadow for a significant amount of time beyond that period of compliance would be unreasonable, and the fact that Deputy Eversole used a placement bite or tactical out procedure to mitigate against more injury, largely irrelevant.

The Court also considered the fact that Defendant was issued several warnings that he would be bit if he did not comply. *See Lowry*, 858 F.3d at 1259 ("[A]n important

consideration in evaluating the [] interest in the use of force is 'whether officers gave a warning before employing the force.'") (quoting *Glenn*, 673 F.3d at 876). It is undisputed that Defendant Eversole twice gave Plaintiff warnings that if he fought or made any aggressive movements, he would be bitten. (Doc. 107-2 at 101; Doc. 129 at 13, 14). But though that fact is undisputed, Plaintiff's actual compliance with those commands is in dispute. As described above, Plaintiff has put forth evidence, including the video evidence, from which a jury could conclude he complied with the officers' orders once the warnings were given. Accordingly, although the undisputed fact that warnings were issued weighs in Defendants favor, it ultimately does not change the conclusion that summary judgment is inappropriate.

Similarly, and although somewhat addressed above, a court may also consider whether a suspect is actively resisting in assessing the reasonableness of the force used. While "[e]ven purely passive resistance can support the use of some force," "the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Id.* at 830. Thus, "where the suspect passively resists arrest, a lesser degree of force is justified compared to situations in which the suspect actively resists arrest." *Lowry*, 858 F.3d at 1259.[10] Even if a suspect is not "perfectly passive," the Ninth Circuit has emphasized that "resistance" "should not be understood as a binary state, with resistance being either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan*, 630 F.3d at 830. Thus, the Court "must eschew ultimately unhelpful blanket labels and evaluate the nature of any resistance in light of the actual facts

_____

[10] The Ninth Circuit has distinguished active resistance, such as "actively attacking or threatening officers or others," from passive resistance, such as refusing to comply with officers' commands. *Glenn*, 673 F.3d at 875. For example, in *Deorle*, the plaintiff "brandish[ed] a hatchet" and a crossbow and threatened to "kick [the officers'] ass." 272 F.3d at 1276-77. The plaintiff also continually roamed around his property despite officers' orders. *Id.* The Ninth Circuit determined that this was not sufficient active resistance to warrant use of a beanbag shotgun. *Id.* at 1282-85. In *Smith*, the Ninth Circuit held that the plaintiff's refusal to obey officers' commands to remove his hands from his pockets to show police whether he was armed, as well as his entry into his home despite officers' orders and his brief physical resistance were not "particularly bellicose." 394 F.3d at 703.

of the case." *Id.*; *see also Smith,* 394 F.3d at 703 (finding that, although an individual "continually ignored" officer commands to remove his hands from his pockets and to not re-enter his home and "physically resisted…for only a brief time," it did not appear that the resistance was "particularly bellicose" and thus this factor provided little support for a use of significant force).

The evidence indicates that Plaintiff was argumentative during the incident at the MCSO substation and in the holding cell. The parties dispute whether Plaintiff resisted, whether actively or passively. Defendant Eversole declares that Plaintiff's actions suggested to Eversole that Plaintiff was actively resisting and "intended to continue resisting." (Doc. 107-2 at 102 ¶ 15). Plaintiff claims he was not resisting and that his movements while Shadow was biting him were reflexive and defensive. (Doc. 128 at 26 ¶ 30). As noted above, the video evidence does not conclusively support either version of the events in the holding cell. Based on the available evidence, the Court finds there is also a genuine dispute of material fact regarding whether Plaintiff passively or actively resisted officers' efforts to subdue him that precludes a summary judgment finding in favor of Defendants.

Because there remain factual issues in dispute as to whether the use of a police canine was reasonable under these circumstances, the Court will deny Defendants' request to enter summary judgment for Plaintiff's failure to establish a constitutional violation.

## V. Qualified Immunity

The Court will now consider whether Defendant Eversole is entitled to qualified immunity. *Saucier*, 533 U.S. at 204 (noting that the "inquiries for qualified immunity and excessive force remain distinct").

### A. Legal Standard

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). However, officials are not entitled to qualified immunity if "(1) they violated a federal statutory or

constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664, (2012)); *see Pearson v. Callahan*, 555 U.S. 223, 230–32, 235–36 (2009) (courts may address either prong first depending on the circumstances in the particular case).

In assessing the second prong of the qualified immunity analysis, the question before the Court is whether the right to be free from the allegedly excessive force was clearly established at the time of the incident. *Saucier*, 533 U.S. at 201. In other words, the Court must determine whether a reasonable officer would be on notice that his conduct was unlawful in the situation he confronted, and at the time he confronted it. *Id.* at 202; *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) ("An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."). "Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id.* at 1152 (quoted source omitted, alteration added). The Supreme Court's "caselaw does not require a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoted source omitted). Though "general statements of the law are not inherently incapable of giving fair and clear warning to officers," the right's contours must be sufficiently definite that a reasonable official in the defendant's shoes would have understood he was violating it." *Id.* at 1153 (2018) (citations omitted). Indeed, the right must be "settled law," meaning that it must be clearly established by controlling authority or a robust consensus of cases of persuasive authority. *Wesby*, 138 S. Ct. at 590–91. "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 589 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

**B.    Discussion**

Because the Court has already determined that there is a question of fact whether Defendant Eversole violated Plaintiff's Fourth Amendment rights, the qualified immunity analysis turns on whether the right at issue in this case was clearly established at the time Plaintiff's claim arose.

Plaintiff first argues that Defendant Eversole's violation of Plaintiff's rights is "so patent and obvious that a prior body of case law on point is not required to defeat" Defendant Eversole's claim of qualified immunity. (Doc. 126 at 7). Citing the Ninth Circuit decisions in *Mendoza*, *Chew*, and *Watkins*, Plaintiff also argues that that "there was of course binding authority in the Ninth Circuit and elsewhere that prohibited Eversole's egregious conduct." (Doc. 126 at 6-9).

In *Mendoza*, officers used a police dog to apprehend a burglary suspect. In assessing whether the law on the use of police dogs to apprehend subjects was clearly established at the time the plaintiff was bitten, the Ninth Circuit affirmed the position that "a more particularized expression of the law" was not "necessary for law enforcements officials using police dogs to understand that *under some circumstances* the use of such a 'weapon' might become unlawful." *Mendoza*, 27 F.3d at 1362 (emphasis added). The Court then gave a specific example of such a circumstance, stating, "**no particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control**." *Id.* (emphasis added).

Soon after *Mendoza* was decided, the Ninth Circuit in *Chew* assessed "whether it was clearly established that it was unlawful to use police dogs to search for and apprehend concealed suspects by biting and seizing them." 27 F.3d at 1449. In finding that there was no clearly established law to put the officers on notice of the unlawfulness in using police dogs in this manner, the court explicitly stated that this type of circumstance was "far different from the siccing of dogs on handcuffed arrestees," and noted that the unlawfulness of the latter was "indisputable." *Id.*

In *Watkins*, an officer released his canine to search for a fleeing burglary suspect. The dog found and bit the suspect out of sight of the officer. When the officer arrived on the scene, he did not call the canine off, but kept the dog on bite for ten to fifteen more seconds until the plaintiff complied with the officer's orders that plaintiff raise his hands. The dog continued to bite the suspect during that time. In assessing whether clearly established law existed at the time of the incident that would have put the officer on notice as to the unlawfulness of his conduct, the Ninth Circuit first found that in accordance with the holding in *Chew*, the officer's directive to his dog to bite and hold an out of sight suspect did not violate clearly establish law. *Id.* at 1092. The court, however, found differently as to the plaintiff's claim that the force applied "*after* the officers caught up with [the canine] amounted to an unconstitutional application of force." *Id.* at 1093. Citing and quoting *Mendoza*, the court affirmed the district court's denial of qualified immunity because "it was clearly established that excessive duration of the bite and improper encouragement of a continuation of the attack by officers could constitute excessive force that would be a constitutional violation." *Id.*

Defendant Eversole contends that "no U.S. Supreme Court precedent[11] existed as of July 2017 that was sufficiently similar to the facts of this case to have put Deputy Eversole on notice that deploying Shadow and allowing him to remain on-bite for over three minutes would violate Plaintiff's Fourth Amendment rights." (Doc. 102 at 9). He further argues that the distinguishing point between *Mendoza*, *Watkins*, and this case is that "Deputy Eversole did not use Shadow to locate a hiding suspect." (Doc. 102 at 11). The Court does not find this point of difference to be persuasive for Defendant. *Mendoza* and *Watkins*,

---

[11] Defendant argues that the Ninth Circuit law cited by Plaintiff is "limited even if [] factually on point" because the cases are not Supreme Court cases. (Doc. 102 at n.4). Defendant points to a footnote in *Wesby* in which the Court stated, "We have not decided what precedents—other than our own—qualify as controlling authority for purposes of qualified immunity." *Wesby*, 138 S.Ct. at 591 n.8. However, the Court immediately thereafter stated, "We express no view on that question here." *Id.* The district courts in the Ninth Circuit have repeatedly looked to Ninth Circuit *and* Supreme Court opinions as "controlling authority" for purposes of qualified immunity, and this Court will not stray from that practice. Nor does the Court find it is compelled to do so following the Supreme Court's statement in *Wesby*.

both of which were decided years before the incident in question, provided notice to Deputy Eversole that an officer cannot use or continue to deploy a canine on a person that has fully surrendered or is in the control of officers. The fact that Plaintiff was already in custody and not being pursued by Shadow weighs *against* the reasonableness of his deployment, and in no manner detracts from the notice that Deputy Eversole should have had that Shadow's deployment was unlawful in this context. "The law is not that 'an official action is protected by qualified immunity unless the very action in question has previously been held unlawful,' but rather, 'that in the light of pre-existing law, the unlawfulness must be apparent.'" *Hardwick v. Cnty. of Orange*, 844 F.3d 1112, 1117 (9th Cir. 2017) (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

Indeed, the general, well-established rule that an officer cannot constitutionally use force on a person who has been subdued or rendered helpless has been applied in a variety of factual situations, not just situations in which the force used was a canine. *See, e.g., Watkins* 145 F.3d at 1090 (holding that defendant was "obviously helpless" before he was handcuffed such that continued encouragement of canine attack constituted excessive force); *Mendoza*, 27 F.3d at 1362 (holding that "no particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control"); *Blackenhorn v. City of Orange*, 485 F.3d 463, 478, 480-81 (9th Cir. 2007) (denying qualified immunity to officer who allegedly punched suspect in the face after plaintiff was on the ground, surrounded by officers, and no longer resisting); *Drummond*, 343 F.3d at 1057-58 (holding that officers' alleged act of prolonged pressure onto detainee's prone body as he lay on the ground handcuffed and gasping for air constituted excessive force); *Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) (holding that repeated use of pepper spray against nonviolent protestors under police control rose to the level of excessive force); *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000) (finding that use of pepper spray after "an arrestee surrenders and is rendered helpless" is obviously excessive force). *Cf. Chew*, 27 F.3d 1449 (distinguishing

the policy of allowing police dogs to search for and apprehend concealed suspects by biting and seizing them from the "indisputable" constitutional prohibition against "siccing [] dogs on handcuffed arrestees"). In light of this authority, the Court concludes that it was clearly established by July 2017 that an officer may not use force, including the force of a canine, against a suspect who has been subdued or been rendered helpless.

Viewing the evidence in plaintiff's favor, a reasonable jury could conclude that Plaintiff was subdued before Deputy Eversole directed Shadow to bite his upper leg and during the three minutes he was on bite. It is undisputed that Plaintiff was lying on the ground on his back when Shadow was deployed. Plaintiff was handcuffed, in a jail cell, with one officer standing above him and two more and a police dog standing close by. The officer standing over him was attempting to release him from his handcuffs. The Court finds that a jury could find that no reasonable officer would have believed that he could use a severe amount of force - a three-minute dog bite hold - on such a suspect. *See, e.g., Watkins*, 145 F.3d at 1093 (affirming district court denial of qualified immunity because "it was clearly established that excessive duration of the bite and improper encouragement of a continuation of the attack by officers could constitute excessive force that would be a constitutional violation"); *Blackenhorn*, 485 F.3d at 478, 480-81 (holding that it was unconstitutional for officer to punch suspect in the face and body when suspect was lying on the ground and not resisting). Where there are several disputed issues of material fact and "[w]here the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate." *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003). At this stage, Defendant Eversole is not entitled to qualified immunity on this claim and the Court will therefore deny Defendants' Motion for Summary Judgment on this basis

## VI. Battery Claim

Because the Court has concluded there is a genuine dispute of material fact regarding whether Defendant Eversole's use of force was reasonable, the Court must also deny the Motion for Summary Judgment as to Plaintiff's battery claim. *Cf. Cable v. City*

*of Phoenix*, 647 Fed. App'x 780 (9th Cir. 2016) ("Because there is a genuine dispute of material fact as to the amount of force used and the reasonableness of that force, the district court erred in granting summary judgment on Cable's state law assault and battery claim.") (citing Ariz. Rev. Stat. § 13-409) (shielding officers from liability for use of force when several factors are met, including that "[a] reasonable person would believe that such force is immediately necessary to effect the arrest or detention or prevent the escape").

**VII.    Defendants' Motion to Exclude**

Defendants move to exclude Plaintiff's expert, Ken Katsaris.  (Doc. 95.)  In ruling on the Motion for Summary Judgment, the Court did not rely on the opinions of Mr. Katsaris or Defendants' expert, Mr. Eden.   The Court will therefore deny Defendants' Motion to Exclude. The parties may more appropriately raise these issues in motions in limine in the event there is a trial in this matter.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion to Exclude (Doc. 95) and Defendants' Motion for Summary Judgment (Doc. 102).

(2)    Defendants' Motion to Exclude (Doc. 95) is **denied.**

(3)    Defendants' Motion for Summary Judgment (Doc. 102) is **denied**.

(4)    This action is referred to Magistrate Judge Michelle H. Burns to re-conduct a settlement conference.

(5)    Counsel shall jointly call Magistrate Judge Burns' chambers at (602) 322-7610, within 14 days to schedule a date for the settlement conference.

Dated this 29th day of October, 2020.

Honorable Diane J. Humetewa
United States District Judge